Good morning, your honors. My name is James Baracoletti from Norfolk and I represent Mr. Palmer in his appeal from the denial of a suppression hearing by the district court in Norfolk. I'd like to begin by talking about what I think are some valuable lessons for all of us to have learned as a result of the testimony by Officer Ring in this case and the conclusions that Judge Jumar made in denying the motion to suppress. First of all, don't have a post office box on your operator's license. Don't have that to ensure that you have an absolute certainty of getting your mail. That's found on Joint Appendix 81. Can you speak up a little bit? Yes, sir. Don't drive your family member's car. Don't in fact even borrow somebody else's car. That's reasonable suspicion that you're a drug dealer. That's found on Joint Appendix 82. Don't drink a Coke or eat McDonald's while you're in your vehicle. That's also suspicious because it's indicative of you're not trying to have a conversation with the officer. That's found on Joint Appendix 99. Don't stay too close to your car or, in the opposite, don't walk away from your car. You're sort of trying to divide and conquer, aren't you, by taking one little piece of evidence and another little piece of evidence? No, sir. I think that while you have to view the totality of the circumstances, but I think the point that I'm trying to make is, as so many opinions of this court have concluded, the most recent being Slocum, what the government has tried to do is take this innocent conduct of a defendant, of a citizen, and cobble it or web it together. If you want to use that as an example, don't do each one independently. Give all of them. And then at the end of it, say, don't do all those things. And then say, that's not enough. That's the point. In other words, it's well-intended what you're saying. You're exactly correct. Don't do these individual things. But in order to make this point, you're going to have to put all of them together and come to that conclusion. Because if you do it independently, you're going to lose everybody on this court. Yes, sir. Yes, sir. And what the court found is the totality of all of these circumstances that we've just talked about yielded a reasonable suspicion for the officer to be able to detain Mr. Palmer to await the arrival. What are you going at? I mean, there are different phases of this. Are you contesting the absence, are you saying that there's an absence of reasonable suspicion for the traffic stop? Are you saying that there was no reasonable suspicion to detain the individual? Or are you saying that there was, I mean, you sort of seemed to me you were going at everything. But which is specifically going at? Well, the initial traffic stop we raised in the brief in terms of the reasonable suspicion for the officer to believe that the tent was too dark. I'm not going to concede that, but I think that there are other more important issues to be able to raise and to argue before the court. You would have a difficult time with that. Yes, sir. Because in fact, the inspection shows it was too dark. Yes, sir. Which is why I'm moving on from that. It was illegal and illegally too dark. Yes, sir. Correct. It was a legitimate stop. Yes, sir. I'm not going to argue that point to the court. I think that there are more important issues to be able to raise. I think the most significant issue to raise before the court is whether or not those factors that the district court found in its order on page 220 of the joint appendix, whether all of those factors constituted a reasonable suspicion to be able to detain Mr. Palmer to await the drug dog, which took approximately 29 to 30 minutes. They were also waiting to get information on him. They were just waiting for the drug dog. They were doing a lot of other things. Yes, sir. I hope the court's looked at the video and has considered it. At what point was the traffic stop completed? Well, the officer never even broke out the summons book. He never even started to write a summons, never considered writing a summons, which is distinguishable from a number of the other cases that the government has cited. Let's get down to the question of whether this was any kind of a prolonged detention. The officer was correct on the window tinting. That's kind of different from ... Window tinting is kind of different from where your tail light is blown out. They might both provide a basis for a stop. A blown tail light is different from window tinting because window tinting does suggest concealment and concealment of criminal activity, unlike, for example, failure to stop at a stop sign or sufficiently at a stop sign. I mean, the window tinting does suggest concealment. We start with that and the district court said there was something wrong with the inspection sticker, but I think that that's a less important point. Now, you can't just detain somebody on the basis of a traffic stop alone. We understand that from Rodriguez, but when you combine the window tinting and the concealment aspect of it, and then the officer notices a large number of air freshening devices, such as, I think there were five of them, and he was able to detect the air fresheners from outside the car. Then, as Rodriguez says you can do, he checked whether there was any outstanding warrants, and the thing came back. The Norfolk Police Department says this individual's a member of the Bloods. So, doesn't the combination of window tinting, air fresheners, member of Bloods, and the report back from the Norfolk Police, doesn't that provide at least reasonable suspicion? Not to search the car, and the officer, even at that point, did not search the car. He brought the dog on, and it was only when the dog came on that the officer thought, and alerted positively, that the officer thought the reasonable suspicion had ripened into probable cause. What is wrong with that? Well, a couple of things, if I could. Number one, with respect to the window tinting. The tinting was just barely below the legal limit. It wasn't such an extreme, and the court also can tell by looking at the video that as soon as the officer walks up to the car, you can see through the back window of the car, you see bags, you see articles that are sitting in the back seat. So, it's not to the extent that it's so blacked out that you can't see anything. Well, no, but isn't there a difference between 50, and 40, and 35, and 25? Sure, there's a difference, I agree, but I'm saying that it's not to the extreme that one would, therefore, consider in and of itself. But it was enough to justify a stop. Correct. It's like saying 60 mile an hour zone, you don't stop somebody that's going 65. I agree, but I think that it has to be relative in the context of the court's concern, is that window tinting in and of itself reflects some intent. He did have that second basis, and I thought that was all right, because he said it looked like it was fraudulent, I believe, the inspection sticker. Correct, he said... He believed that it was a fraudulent inspection sticker. Because... He got a closer look at it and said he changed his mind. But that... He got the benefit of it, after he looked at it, he changed his mind. Because he was right, he had to give him the benefit of it. What's that? He was right. Well, once he ascertained, but for the purpose of what happened initially, you've got to give him credit for what he thought. But initially... What he thought. He thought the tinting was too dark, he thought the inspection sticker was fraudulent. Okay, that's the stop. One was right, one was incorrect. That's the stop. We're now on part two. We're at the second prong of Terry. During the stop, he found out all this other stuff. He's into bloods and all these... Three minutes into the video, he says, there might be something to this. He completely abandons the whole purpose of the traffic stop. Completely abandons it. As I said, he never even begins to write a summary. When you put it all together, you get the window tinting, plus the air fresheners, plus the check of the database and the bloods membership. And the rest. Even that, the officer doesn't say amount to probable cause, but doesn't that at least amount to reasonable suspicion? I mean, that would be a pretty extraordinary holding to say that all those things did not even involve reasonable suspicion. I disagree, Your Honor. I think that it would not be an extraordinary holding, and I think it would be in line with Slocum, Massenburg, Powell, Foster, and DiGiovanni, the previous cases that this court has held, those innocent facts do not rise to the level of reasonable suspicion. And the facts in those cases, I'd submit to the court, were more egregious than this particular case. And we have... Let's, for example, Officer Ring said that this defendant was nervous. He was nervous. At one point, he says he's nervous, and at the second point, he says he's playing it too cool for school. Okay, that's fine. You heard in my comments, I didn't attach a lot of significance to that, and I didn't attach a lot of significance to the fact that he's in a high-crime area. I think that those kind of things by themselves, you know, a lot of people are nervous, and people should be able to travel through a high-crime area without getting pulled over because not everybody in a high-crime area is a criminal by a long shot. Yes, sir. But it's, again, everything taken together. And we're not even asked to say that it's probable cause. I don't think it probably is probable cause. But at least it's reasonable suspicion to justify a little bit longer detention until the dog comes in. And then the dog, there's no excessive force here. The dog wasn't, thankfully, unleashed on anybody. But the dog sniffs, alerts positively. Only at that point, when all of these things are accumulated together and put together with the positive alert, only then, only then does the officer say, I've got probable cause to search. Yes, sir. If I could direct the Court's attention to Powell, and I know Judge King, you dissented on that opinion. But in the Powell case, you have a number of factors that are present in this case that the Court found was not sufficient reasonable suspicion. In Powell, you had a protective order, which was a caution data, which is similar to what the district court ruled in the Officer Ring in this particular case, like in the Bounty Hunter Bloods issue too, a caution data. In Powell, you also had a prior record of the defendant. Here you have a prior record. So in those particular circumstances, again, that court in 2011, and I know Judge King, again, you dissented, but the majority held that those facts were not sufficient to be able to establish reasonable suspicion. And, in fact, in Powell, it goes one step farther because he misrepresented the status of his operator's license to the officer, none of which is present in this particular case. In fact, it's exactly the opposite. The Court, when it looks at the video, sees Mr. Palmer in his car acting perfectly appropriate. It's daytime. It's a heavily traveled thoroughfare. It's a residential neighborhood. He sits in his car. He answers responsibly all the questions that the officer has. License is fine. What did the district court do? Did the district court, who is it, what kind of live testimony was there? We had Officer Ring testify. He was the only government witness. We had the individual that installed the tent testify from the defense standpoint. Did Mr. Palmer testify? No, he did not. Well, he did, of course. But no need for that particular point. But then we had also the gentleman from Treadquarters that did the state inspection sticker. Other than that, it was the video. And then the judge wrote an opinion. He did, on page 220 of the— And we give his factual findings deference under the clear error standard. Correct, unless they're plainly wrong. And I'd suggest to the Court that he is plainly wrong in several of the factors that he found. Number one, that the defendant was nervous. There's no indication— So it's a clear error that he was not nervous? Yes, sir. The Court looks at that video. You have no shaking. You have no sweating. You have no pulsing of the arteries. Did the officer say he was nervous? He did, multiple times. So the officer said he was nervous, and you say the video contradicted him. Correct, and the district court credited that nervousness. But the video— Can a district court do that? It can credit an officer's testimony. It can, but I'd suggest to the Court, when you have the video and audio testimony— It resolves conflicts. It has to resolve conflicts. I think the best evidence is the video. The officer said at one point he's nervous, but he said he was also suspicious because he was too cool for school. You can't have it both ways. You can pick at this and that, but— And I'm not trying to. I'm trying to talk about the totality. I promise you I am. I get you. I get you. You can't talk about the totality of circumstances unless you talk about each circumstance. I give you that. We've got cases that say this nervousness thing doesn't get you very far with the government. Because when anybody gets stopped by the police, they're nervous. Sure, I understand that, but I answer the Court's question. You've said that Judge Dumar made factual findings, and it's to be upheld, and I agree with you. But in this particular point, there are several of his findings that are not supported by the legislature. But there's some of these things that are primary and some of these things that are secondary. And I think that the nervousness is not the primary thing, or the fact that it was the characteristics of the particular neighborhood or community. That's not a primary thing. What are primary, it seems to me, are the combination of the concealment tent and the Bloods membership and the air fresheners. Not just one. I think there were five of them operating in that car, and the officer didn't smell marijuana outside the car, but he definitely could tell from outside the car that those air fresheners were operating there. How many people have five air fresheners in their car and combine it with tinted windows? Doesn't that suggest at least reasonable suspicion that there's something going on that you don't want people to know about? No, sir, I disagree with that. But I think part two of your question, though, has to be, it's not his car. It's not his car. So you're attributing these concealment factors and air freshener factors to a car that doesn't belong to him, that he's borrowed from somebody else. And can you therefore ascribe to him the motives to conceal, the motives to hide things, when it's not even his vehicle? The difficulty with this case is that the law has pretty much been set, and yet what we look for are these factors. And it really comes down to a call of what we determine is sufficient in terms of the factors. And I think you probably started out rather correctly, but it's just not the standard. If you looked at each one individually, it just wouldn't be enough. Your real argument is that it's a bunch of nothings. And if you add a whole bunch of nothings, it ends up to be nothing. And that's exactly what... But your problem is, is that when you look at court cases on it, you know, the courts have sort of bent over to deal with this thing and deal with what on one hand is a reality of what the officer kind of knows. On the other hand is, well, you could do this with a whole bunch of people. And I'm not buying, I don't exactly buy the business that you've got a tenant window and air fresheners. That means that you've got something suspicious. A lot of people have got that. Maybe a cultural difference. I don't know what it is. I don't necessarily buy that. But when we kind of follow the law as it's set up, and that's the difficulty you may run into, is that when we're dealing with the precedent of the law as it is. But the reality is that I actually think you're probably making a pretty good argument here. And I'm struggling with it because on the one hand, these factors are there. And if we're doing it in the proper level of review, it's very difficult to get to where you are. On the other hand, the reality is what you just said it is. That is that, you know, when you add all these things together, you know, is it really enough? And if I could just respond. I know I'm into time. I apologize. But with respect to the precedent, the precedent of this court in Slocum, Massenburg, Powell, DiGiovanni, all of those cases weigh heavily in favor of Mr. Palmer. What about one thing nobody's mentioned is the criminal record was disclosed. That's correct. And Judge Dumas emphasized that too. He had four prior arrests, at least some of them involved narcotics charges. And Powell deals with that. Powell deals with that. Powell says that, again, is not sufficient to establish. But that's another factor. I understand that. The guy's got a track record. At what point in time? He knew that once he got into the computer, right? That's correct. Yeah. Correct. But I'd ask you to also take a look at the cases that the government has cited with respect to the extraordinary factors that are present in those cases where this court has found that there has been reasonable suspicion. But that four prior arrests coupled with this Bloods Gang thing, it seems to me to give some weight to this thing. Well, that's enough to At least for reasonable suspicion. So because somebody's past is there, that's sufficient for a police officer to detain you for 30 minutes. At some point, that past has to be erased. At some point, you've paid your dues to society. And at some point, that can't just keep counting against you so that every time you get stopped by an officer, you're subject to search. That can't be the law. And when the court looks at Judge Wilkinson's decision in Branch and the court looks at the Green decision, all of those facts that are present in those cases are much more egregious in this case in which the court has found that reasonable suspicion did exist. All right. We thank you very much, sir. Now, Mr. Catazon, we're pleased to hear from you. Morning, Your Honors. May it please the court. Judge Dumas' conclusion that the factors here support a reasonable suspicion that criminal activity was afoot is well supported by the factors that are before the court. As we've discussed, you would agree that none of those factors alone would be sufficient. That's pretty clear, isn't it? I think that's right. Which one is the one that tilts? At some point in time, you start with a factor, you know, if it's nervousness, that's not enough. When does it become enough? Tell me when it got to be enough. I know that sounds sort of unfair in a way, but I kind of want to know because it helps us understand how these cases are analyzed, and it helps so that we can be consistent on the opinion. I want to know how many of these factors did you need, and I don't think that's unfair because you say, well, that's not this case. You've got eight factors. But I want to know for purposes of our analysis, when did we hit that level? What are the factors? Let's talk about what Officer Ring knew after he completed the computer checks inside the cruiser before returning to Mr. Palmer's car. At that point, he knew that Mr. Palmer had five air fresheners that were emitted an overwhelming odor of… Five air fresheners is one. Tinted windows. In a car that he doesn't own. A member of the blood gang. Criminal history that included… Now, the significance, I want to touch that because I want to make sure I understand. I know blood gangs, but that's not a crime to belong to a gang, and I know the blood has a reputation of doing things that are not so great. But a lot of people belong to organizations not so great, but that in and of itself is nothing other than the exercise of one's free right association. Of course, that… I'm not trying to be difficult on this. I'm just trying to make sure we… And I get it. Blood is bad. But there are a lot of organizations I could say the same thing for and other people don't think as much of them. I don't think some organizations are too strong either. You belong there. I wouldn't care much for you either, but I'm not going to use your constitutional right to associate with whatever group you want against you. And to that point, I would say a few moments ago, Judge, when you mentioned whether you have a lot of nothings plus nothings add up to nothing. And in this case, that is not… Membership in a blood gang… When did it become something? I just want to know that. I'm trying to figure this out because we are going to come across these cases and it's troubling me to some extent. At some point in time, it has to become something. Two things have to add up and say, whoa, when you put those two… And that happens. I mean, in chemistry, that's true. You can have two things in there. You put them together, you've got something that's volatile. That's what I want to know. And that was when Officer Ring was in the cruiser and completed the records check. In addition to what we've already discussed, the blood gangs factor, at that point he knew that he had four narcotics-related convictions, had a conviction for being a felon in possession of a firearm. He knew that… Now, Judge, Dumar doesn't say he had four previous convictions. His opinion says he has four previous arrests for narcotics charges as well as a charge of possession of a firearm by convicted felons. He doesn't say any of those are convictions. He says there was a convicted felon somewhere to get under the firearm. He's got five previous arrests, it looks like. That's what he recited. Now, you just said he had four previous convictions. That was an incorrect choice of words by me, but I should say… It's very significant to make that choice of words because it's a whole different ballgame of someone who's been arrested as opposed to convicted. Of course, but he had at least one felony conviction because apparently he was charged with having a firearm as a convicted felon, and he had four prior arrests for narcotics charges. That's correct. Now, that's right. We mentioned that earlier, but is that the point that he had enough? That's right. When he's in the car… Is that your answer? My answer to Judge… When he found out about the prior charges, that was enough? No, I'd say my answer to Judge Wynn's question is when he completed the records check in the car. When he completed the records check. And then he knew all these things that Judge, on page 220, that Judge Dumar recites? That's right. There are eight factors that… Eight factors. That's right. Taken together… Totality… By the right standard… The totality of those… When taken together give rise to reasonable suspicion… And, of course… Because they eliminate a substantial portion of innocent travelers and indicate that criminal activity is afoot. That's what Judge Dumar said. And, of course, reasonable suspicion, Your Honors, is, as the court knows, below probable cause, below preponderance of the evidence. The standard here is whether in the totality of the circumstances… Once he had the reasonable suspicion, he could use the canine dog? That's right. He had the… With the reasonable suspicion, the officer was entitled to detain Mr. Palmer in order to wait for the dog to… And Rodriguez is irrelevant at that point. Right. Rodriguez dealt with a situation where there was not… But he dealt with canines. He dealt with the dog sniffs. But you're saying it doesn't have anything to do with this because you're not invoking a de minimis rule. That's correct. Under Rodriguez, it was purely a traffic stop, or at least based on the record in Rodriguez, it was only a traffic stop. And there was no discussion of whether there was additional reasonable suspicion beyond the traffic stop. I point out on the… Since Your Honors brought up the de minimis rule, on remand in Rodriguez, the Eighth Circuit, which also had a similar de minimis rule, said that we don't even need to reach the reasonable suspicion issue because under our governing circuit law at the time, pre-Rodriguez, the de minimis rule was in effect, and the officer in good faith relied on that de minimis rule. The court could do the same here, given Ferrier and similar cases in this court that pre-Rodriguez… One of the things that struck me about this case is there is an element of restraint on the part of the police officer here. There were probably… Officers, when faced with this collection of circumstances, the tinted windows and the five air fresheners and the four previous arrests and the charge for conviction of a felon, a member of the gang, and all the rest, it would have said, oh, with all of these things, I've got probable cause. There's a drug offense going on here. I'm going to get into this car. And we've had situations where some officers felt that this was enough of a search. This officer said, all right, this gives me reasonable suspicion to detain, but I don't think I have probable cause at this point to go into that car. And I actually believe that the law enforcement officer deserves some credit and some respect for not just taking this collection of factors and saying it's all probable cause, I'm going into the car. He waited, and it was only when the dog arrived and alerted positively that he thinks, all right, I've now got enough to go in. But this wasn't somebody who just barged in. As I say, there was no excessive force here. There was purely a detention. And the detention was because the officer didn't want to proceed immediately with the search. He said, I haven't got enough. And that, you know, a lot of police officers wouldn't have said that, I can tell you, because it's on the air. And on that point, I would urge the court, if it hasn't already, to review the video, which shows that Officer Ring carefully, you can see reasonable suspicion, as Your Honor notes, developing throughout the stop. And at one point, Officer Ring actually gets on the phone, perhaps with the supervisor, but it's not clear from the video, and relays the factors that he already has in making the decision to call for the dog. One of the factors that this court has noted that it looks at in looking back on a stop is whether it appears that the factors were a post hoc rationalization by the officer or by the government. In this case, the video clearly refutes that. It shows, just as Your Honor was saying, the carefulness that Officer Ring was going through as he, in his mind, established these factors one by one. And you can hear him articulating that to the other officers. This is what Judge Dumar said. He looked at it. He listened to the officer. He watched the video. He said, this was not a person who abused a detainee in any way, shape, or form, as far as I'm able to determine. He wasn't impulsive. It was a careful, methodical, law enforcement action. And the district judge's impression on these has got to count for something. We heard a case a little earlier this year. The district judge had suppressed the evidence. And sometimes maybe I, as a district judge, would not have suppressed the evidence. But I said, look, the district judge, they're on top of this stuff to the degree that I'm not. And I've just got to respect it, whichever way it goes. And this is not one of those bad actors. I mean, they're out there. The White House, they're bad police actors out there. But this doesn't have those indicia. And the district court did specifically find that he believed Officer Ring to be credible. And on Your Honor's point, the video itself affirms, confirms those findings by the district. How about on the issue of whether he was nervous or not? Your opponent there says, opposing counsel says that the judge said he was nervous, but the video contradicts that. This court has certainly said. And that's clear error. He says that's clear error. That prong number, factor number three, he said is clearly erroneous. And he said some others were, too. But he persistently pointed out that. I would agree that the nervousness factor in this case is not necessarily strong. It's not required for the court to make a decision. You don't need it. Don't need it. But I would dispute that it's clear error. The district court had the opportunity to evaluate the officer, specifically found his testimony to be credible. And the officer testified that he deemed Mr. Palmer to be nervous. In this case, the government does not seek to put weight, extensive weight on that. You don't think that's a very good factor? It's not very good. It's a general proposition. In this case, not a very good factor. Do you agree that everybody's nervous gets stopped by the police? I would agree that this court's cases have certainly held that some degree of nervousness is natural in any stop. I would say that in a different case where there's more significant evidence of nervousness, it's important for that factor to be something that the court can rely on if there are objective indicia that really support it. The nervousness is one of the less persuasive, if I put it gently. I think that's right. The nervousness is one of the less persuasive. In this case, yes. Let me answer this question with regard to the talk about the entrance into the vehicle. Apparently, Officer Raines called for a K-9 and then determined that either that officer or the K-9 was somewhere else. He couldn't reach it. And then he went into the vehicle to look at this inspection sticker. And he looked at the inspection sticker and got the number and checked it out and decided, well, it turns out this was a valid inspection sticker. While he was in there, he says, I smell marijuana. And he comes back out, and at some point in time, he then actually does get a K-9 officer. Is that right? That's right. Why, when he didn't get the first K-9 officer, instead of coming into the vehicle, why didn't he just call for another one? So, watching the video, you can see Officer Raines make numerous calls for a K-9. He first requests a K-9 at 4 minutes and 20 seconds into the video. At 5 minutes, he asks his partner if he can attempt to call a K-9. At 6 minutes and 30 seconds, he again asks the partner to call a K-9. You can hear the partner on the phone appears to be attempting to get a call for a K-9. They discuss getting a K-9 again at 7 minutes and 30 seconds, at 8 minutes and 20 seconds, at 9 minutes and 45 seconds. Sorry, once more, at 11 minutes and 30 seconds. After he goes into the car, you'll see in the video, Officer Raines gets or makes a phone call to what appears to be Officer Duncan, who had the K-9. Another one. He had been trying to call either Officer Daly or Duncan. It appears that Officer Daly was in a meeting, and they were trying to… But in the interim, he went in his car. In the interim, but on the… The car. To check the inspection sticker. Was that the method that, I mean, I think at court, wasn't there some kind of registration that was shown that he could check and make sure that was okay? I mean, aren't you supposed to use the least intrusive method when doing something like that? So, let me finish your question on the K-9, and then I'll come immediately back to this question, Judge Wayne. But is that a correct statement of the law, that he is to use the least intrusive method? No, I don't think that that's a correct statement of the law. And the Supreme Court has held… So, you can go into a car and check an inspection sticker, even though there may be another method by which you're doing it. Putting them inside the car is some form of intrusion. And the question of whether the least restrictive method is required, the Supreme Court has held in Navarat that the officer does not need to use the least restrictive method. And the just explanation for that is that it's easy for us in a post hoc Monday morning quarterbacking situation to imagine other ways that an officer could potentially have gotten similar evidence. The question is whether the method that the officer actually used violated someone's constitutional rights. That's why they're least restrictive. One thing I was going to ask you. The inspection sticker was one of the two reasons for the traffic stop. In order to write up the ticket and indicate what you were going to write it up for, you'd almost have to look at the inspection sticker. When she thought it was too light, Judge Dumas said, well, I credit your observation that it was too light. But in order to write the traffic ticket, you would probably have to look at the inspection sticker and at least look at it from behind. That was all he did. To determine whether the information that the state requires be on the back, to determine whether it's there, that's right. You have to look. You don't want to write up somebody for something that's not. The Supreme Court has held in New York for its class that there's a lessened interest in privacy expectation in vehicle identification numbers and just the lesser expectation of privacy. Was there a way of validating the inspection sticker one way or the other from the outside of the car or was it just looking through the windows or what? On this record, no. Mr. Palmer has raised the idea that there was a state database, but there's no evidence that that existed or that the officer had access to it. And then Mr. Palmer has also said, well, he could have asked for the sheet of paper, but there's no evidence that Mr. Palmer had that in the car with him or whether that in and of itself would have allayed the officer's concern about the particular sticker. Officer Ring does, in his report, he says he stopped him because of the inspection sticker. But then he testified and said he didn't recognize that until the vehicle was stopped. In the video, you'll see that as Officer Ring walks up, he says they stopped him for the tint and also for the sticker. I know that's what he said in the report, but his testimony says that he did not suspect the sticker was fraudulent until, as you say, he approached it, he walked and stopped it, and then he began to approach the vehicle. So that wasn't the reason he stopped it. It was something that developed once he began to approach it. I disagree in that Officer Ring testified that as he drove by Mr. Palmer's car, he noted that the sticker appeared to be a lighter color of yellow than he suspected it should have been. He then noticed when he got closer that he couldn't see the perforation on the sticker.  There's clearly a basis here for Officer Ring to have stopped the car. It's your proposition that this criminal record was previous convictions rather than previous arrests? Judge Dumar said previous arrests. You're saying convictions. That was simply a misstatement by my partner. So it's arrests rather than convictions. That's correct. And it was a charge of possession of a firearm. It wasn't a conviction on possession of a firearm. It's right. A criminal record that included four previous convictions. That makes a lot of difference. It would to me if it was five previous convictions. That would be a lot better point. In general. But this is right, what the judge has. What the judge has is right. I misspoke previously, and I would say of course there's a difference between charges and convictions. But on this case, for the reasonable suspicion analysis, the charges contribute significantly and don't diminish the fact that the reasonable suspicion existed. I understand. Any more questions? Thank you, Your Honor. Thank you. Mr. Broccoletti. To answer Judge Wynn's question, yes, DiGiovanni held that the officer has to use the least intrusive method possible in order to obtain verification or to dispel his suspicions. Talking about the inspection. Was there a less intrusive method? He says that there's no evidence there's a state database here that could have been used. The court has in the joint appendix the picture that was introduced as the defendant's exhibit of the inspection sticker. On the front of that displays the registration number for that sticker. It's our position that that registration number therefore demonstrates that there's an ability that the officer has to be able to ascertain the validity of it. But number two, the officer doesn't have to go inside the car to look at that inspection sticker. What difference does it make? Why wouldn't there be plenty regardless of whether looking in the car is bad? Plenty of? Oh, plenty of reasonable suspicion. Okay, well then we'll get to that. I agree. I'm just answering the inspection sticker part to put that aside. Let me ask you another question about this. This idea that the officer has to use the least intrusive means, I thought the Supreme Court on several occasions said that that's not the test. The test is whether the officer had reasonable suspicion for what he did in some instances or probable cause for what he did in other instances. In other words, from an objective point of view, I think what we're talking about is a justification either in reasonable suspicion or probable cause. I think what we're talking about is least intrusive means to be able to confirm or dispel the officer's suspicions with respect to a particular item, in this particular case the inspection sticker. So our position is that he could have stood, and I understand Judge King's question about, well, it's really a side issue with respect to the other things, but just to get it out of the way, he could have stood outside the car where he was and he could have seen the back of that inspection sticker. Did Judge Dumas make any findings to that effect? No. Well, then how could we sitting up here decide that he could have seen it some ways or some ways? Because you have the video and you see where the officer's standing. But the judge didn't rely on any of that for the reasonable suspicion on page 220. Those eight things, I don't believe. Correct. He doesn't rely on it. So it's a red herring here. Well, it's one of the reasons the officer – It's what I call a red herring. Okay. The question is whether they had reasonable suspicion. Then that's fine. I know what they did and then where they had to get the dog sniffed. That's fine. Then we won't address it. That's a red herring that doesn't concern the court. With respect to what should concern the court, however, is that this officer three minutes into the video says there's something going on here. Four minutes into the video, four minutes, he's starting to call for a dog. And what does he know in those four minutes? The only thing he knows is air freshener, tinted windows, and this report from the Norfolk Police. We don't know how long. We don't know under what circumstances. We don't know anything about the report from the Norfolk Police other than he's a gang. Well, he also said a caution. Well, that – There was a caution in it. Correct. That's correct. Nobody's mentioned the caution yet. The caution scares me. That's what I was talking about in that parallel sentence. I understand. But the majority in Powell – Caution suggested maybe safety issues. Caution was in Powell. The majority in Powell found that that was not – I know the majority. I was on the short end of that. But I did express my concern. I took note of that, Judge King. I promise you. I know you did. But I expressed my concerns there about officer safety. But he was – my point is – Excuse me. Yes, sir. One of the things the court has been concerned of are prolonged attentions. Correct. And so, as a matter of – perhaps it would be of officer safety, but perhaps it would be in the interest of not prolonging the attention, is to have a dog at least on hand so you wouldn't have to sit around and wait another 30 minutes to get a dog. In other words, I just wonder – I'm not sure we need to read you, but I'm wondering whether one needs to wait 10 or 15 minutes into an encounter before getting a dog because if you impose that kind of requirement inflexibly, you're going to lengthen these detentions because, you know, there are a limited number of canines in many police departments, particularly in rural areas, and a lot of times it takes them quite a while to get there. And so I'm concerned, you know, the laws of unintended consequences. And we could be – in the interest of trying to do something good and admirable, we could be inadvertently lengthening what takes place. And nobody wants to lengthen these things unnecessarily. I agree. So that's why I think we go back to the reasonable suspicion aspect. And if I could just finish up with this one comment. You look at the eight findings that Judge Dumar made. Let's talk about them briefly. High crime area, the court's already said that that's not significant. Well, we didn't say that. We talked about primary factors and secondary factors. But I think that Slocum and the other decisions of this court dispelled the high crime area. Tint, the court has concern about that. Nervousness, that's a secondary factor. My friend, we've been over all that. I understand. But these are the findings that the court made and I want to be able to – I understand it. But we've discussed each one of them and we've discussed them as a whole. Well, two we haven't discussed briefly are the post office box and somebody else's car, the Judge Dumar car. Yes, we have discussed them. Well, but there's no case law to support those as findings of reasonable suspicions. All right. Thank you very much. Thank you, sir. We will adjourn court and come down and do council. Wish everyone in the courtroom a happy holiday.
judges: J. Harvie Wilkinson III, Robert B. King, James A. Wynn, Jr.